## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOVIJO, INC., a Corporation, FRANKLIN FOODS, INC., a Corporation | )<br>)<br>) |
| | )Civil Action No.  03-12 |
| Plaintiffs | )<br>)Judge Arthur J. Schwab/<br>)Magistrate Judge Ila Jeanne<br>)Sensenich |
| | ) |
| SUPERVALU, INC., a Corporation, SUPERVALU HOLDINGS, INC., a Corporation, | )Re: Doc.# 37<br>)<br>) |
| | ) |
| Defendants | )<br>) |

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

It is recommended that the Motion for Summary Judgment (Doc. # 37) filed by Defendants be denied.

### II.   REPORT

Plaintiffs Jovijo, Incorporated and Franklin Foods, Incorporated, hereinafter collectively referred to as "Plaintiffs", commenced this action on January 1, 2003 against Defendants SuperValu, Incorporated and SuperValu Holdings, Incorporated, hereinafter collectively referred to as "Defendants".

On November 24, 2004, an Amended Complaint was filed which raised only one claim- a claim for breach of contract. (Doc.

#29.) Defendants filed a counterclaim which also alleges breach of contract. (Doc. #30 and 31).

Defendants filed a Motion for Summary Judgment which requests dismissal of Plaintiffs' claim with prejudice and judgment on its Counterclaim against Plaintiff Jovijo. (Doc. #38.)

### A.   **Statement of Facts**[1]

Plaintiffs are independent retailers that operate Shop'n Save grocery stores. SuperValu provides grocery products and services to Plaintiffs and other retailers that operate under the Shop 'n Save and Foodland banners. In September of 2001, Spery & Hutchinson, Incorporated, hereinafter "S&H", approached SuperValu and Plaintiffs about participating in its customer loyalty incentive program known as the S&H Greenpoints Program.  S&H prepared a Business Plan and Proposition. S&H and SuperValu gave presentations to Plaintiffs regarding the S&H Greenpoints Program. After the presentations, SuperValu asked Plaintiffs whether they wanted to participate in the Greenpoints Program. Plaintiffs, and other independent retailers, voted 65-3 to participate in the Program, and signed a form which reflected this intent. SuperValu then entered into a License Agreement with

---

[1] As provided in the Joint Statement of Material Facts. (Doc. #39, ex. 1.)

S&H which allowed SuperValu to use the Greenpoints Program and gave SuperValu the right to sublicense the Program to Plaintiffs.

Plaintiffs' Amended Complaint asserts that SuperValu breached a warranty in the sublicense contract which included oral statements and program materials distributed during the S&H/SuperValu presentations. (Doc. #29 at ¶¶4-5.) They alleged that the warranty provided that their net profits, sales and profit margins would increase over a two year period. (Id. at ¶13.)  Defendants deny Plaintiffs' allegations and have filed a counterclaim against Plaintiff Jovijo claiming that it had stopped making payments as required under the Greenpoints Program sublicense for a period of two months. (Doc. #30 at 4, 7-8.) Defendants argue that this issue can be decided on summary judgment because the only matter in dispute is the amount Plaintiff Jovijo owes it.

**B.   Jurisdiction**

This Court has jurisdiction pursuant 28 U.S.C.A. § 1332(a) because the suit is between citizens of different states and the amount in controversy requirement has been satisfied. Defendants' counterclaim against Plaintiff Jovijo is filed pursuant 28 U.S.C. § 1367(a), which allows supplemental jurisdiction over additional claims between the parties.

C.   __Rule 56(c) Summary Judgment Standard__

Summary judgment is appropriate if, resolving all inferences and doubts in favor of the non-movant, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

4

D.   **Discussion**

Defendants' Motion for Summary Judgment raises three defenses to the breach of warranty claim. (Doc. #38.) First, Defendants assert that if the warranties exist, they were made by a third party, S&H, the author of the documents containing the representations asserted in Plaintiffs' claim. Next, Defendants argue that the asserted warranty is merely a prediction of future economic occurrences, and such a prediction is not a warranty. Third, Defendants claim that even if any warranties exist, they can not be liable because the express disclaimer in their contract with S&H limits their liability to Plaintiffs. Finally, Defendants assert that their counterclaim can be decided as a matter of law.

Plaintiffs respond that Defendants adopted the statements made in the S&H materials as its own, and thus an oral contract containing these terms was established between the parties. (Doc. #40.) Plaintiffs also assert that the statements qualify as warranties because they were promises rather than mere estimates of future value.  Further, Plaintiffs dismiss the disclaimer defense by claiming that they were not parties to the contract which contained the disclaimer and were not even permitted to see it. Finally, Plaintiff Jovijo notes that it challenges the accuracy of the invoices, and that Defendants have the burden to demonstrate that the amounts claimed are in fact the actual

amounts owed. Therefore, Plaintiff Jovijo argues that the counterclaim can not be decided on summary judgment.


## 1. Applicable Law

In their first briefs, neither party addressed the question of whether the Uniform Commercial Code (UCC) as adopted in Pennsylvania or Pennsylvania common law applies to the mixed goods and services contract at issue in this case. They argued both interchangeably. Additional briefing on this issue and related contract interpretation issues was ordered. (Doc. # 43.) The parties filed cross briefs (Docs. #44, #45) and cross responsive briefs pursuant to the Order. (Docs. #46, #47.)

The subject matter of the contract, characterized by both parties as a sublicense, was a loyalty marketing program. (Doc. #39, ex. 2 at no.7). The parties dispute the relevant terms of the sublicense.[2] Therefore, the original License Agreement will be used as a benchmark for the terms of the sublicense with the understanding that Plaintiffs' requests to see it were denied by

---

[2] Defendants argue that the sublicense contains the terms of the original License Agreement. Plaintiffs contend that the sublicense was an oral agreement which included written warranties provided in the materials distributed at the presentations. Therefore, the terms of the sublicense are disputed. The parties agree that Defendants' right to sublicense is derived from the License Agreement. (See Docs. #45 at 4; #46 at 3). Therefore, the subject matter of the sublicense will be taken from that agreement with the caveat that Plaintiffs claim that their requests to see it were denied has not been contested by Defendants.

Defendants.

In order for a transaction to be regulated under the warranty provisions of Article 2 of the UCC as adopted in Pennsylvania, a *sale of goods* is required. See generally, <u>Cucchi v. Rollins Protective Services, Co.</u>, 574 A.2d 565, 570 (Pa. 1990) and <u>Whitmer v. Bell Tel. Co.</u>, 522 A.2d 584, 585 (Pa. Super. Ct. 1987).   The parties agree that the sublicense did not involve a sale.[3]  Therefore, Article 2 of the UCC as adopted in Pennsylvania is inapplicable because a *sale* of goods is required.

The lease provision of the UCC, Article 2A, provides that an express warranty is created by:

> (1) Any affirmation of fact or promise made by the lessor to the lessee which relates to <u>the goods</u> and becomes part of the basis of the bargain creates an express warranty that <u>the goods</u> will conform to the affirmation or promise.
> (2) Any description of <u>the goods</u> which is made part of the basis of the bargain creates an express warranty that <u>the goods</u> will conform to the description.
> (3) Any sample or model that is made part of the basis of the bargain creates an express warranty that the whole of <u>the goods</u> will conform to the sample or model.

13 Pa.C.S.A. § 2A210 (a)(1992)(emphasis added). Therefore, in order for the sublicense to be governed by the express warranty provision contained in Article 2A, the Court would have to determine that the sublicense was predominantly a transaction in

---

[3] Both parties characterize their agreement as a sublicense and acknowledge it allowed the parties to participate in, not purchase, the S&H program. (Docs. #45 at 1-2, #38 at 1, 5.)

goods, rather than services.[4] See <u>Cucchi</u>, 574 A.2d at 574 n.7.[5]

The parties agree that the sublicense is a mixed goods and services contract, but disagree about whether the contract predominately involves goods or services. (Docs. #45 at 3,#44 at 7.) Defendants argue that the contract is best characterized as a contract for goods because the services offered were incidental to the goods licensed. (Doc. #44 at 7-10.) Plaintiffs respond that the sublicense can best be characterized as a service contract, with incidental goods licensed to support the services and assert that the parties' own stipulation reflects this understanding.[6] (Doc. #45, see Doc. #39, ex 1 Stip. 9.)

-------

[4] The parties arguments involving the expansion of Article 2A from leases to include licenses is only material if the court finds that the sublicense in this case primarily involves goods.

[5] In a Superior Court case, an alternative test, the gravamen test, was seemingly utilized to determine whether the UCC or common law applied to a mixed goods and services contract. See <u>Turney Media Fuel, Inc. v. Toll Bros.</u>, 725 A.2d 836, 840 (Pa. Super. Ct. 1999). This approach has not been adopted by the Pennsylvania Supreme Court. However, if this approach was a viable alternative to the predominate purpose test, its application would not result in a different outcome in this case. The gravamen test evaluates whether the case is centered around the service or the goods portion of the contract. If the parties are complaining about the work performed, the contract is one for services, and alternatively, if the parties are complaining about the quality of the goods, the contract is one for goods. Thus, under this test the subject of the breach in this case would be characterized as a service breach because it does not directly relate to any goods governed by the sublicense.

[6] Plaintiffs further assert that if the sublicense is characterized as one predominately involving services, its claims for breach of warranty can be re-characterized as a breach of contract to allow analysis under the common law. (Id. at 6.)

The parties also disagree about the terms of the sublicense. Plaintiffs assert that they are not bound by the terms of the License Agreement, but agree that "SuperValu was given the right to issue sublicenses pursuant to the express terms of the master License Agreement. SuperValu then entered into separate and distinct sublicenses with Plaintiffs, which were essentially oral but which consisted of certain written materials which described the Program." (Doc. #45 at 4.) Because the parties have not provided an alternative basis to determine the terms of the sublicense and do not contend that the Defendants sublicensed more goods or services than they received under the License Agreement, the original License Agreement will be used to determine the contents of the sublicense, except to the extent that Plaintiffs would be prejudiced as a result of the provisions they were not given access to.

In Pennsylvania, the predominate feature of the agreement controls whether the sublicense is construed as involving goods or services. See Cucchi, 574 A.2d at 574. In order for an item to be defined as goods, it must be identifiable, tangible and movable. See 13 Pa. C.S.A § 2105 and Whitmer v. Bell Telephone Company of Pennsylvania, 522 A.2d 584, 587 (Pa. Super. Ct. 1987). The predominate feature of this sublicense was participation in the S&H Greenpoints plan, which was implemented and maintained by S&H.  The S&H Greenpoints Program was by definition a customer

loyalty incentive program, which does not clearly qualify as a tangible or movable 'good' or as a service. (See Doc. #39, ex. 8 and 13 Pa. C.S.A § 2105). Therefore, it is necessary to evaluate the items subject to the customer loyalty incentive program to determine whether it primarily involved goods or services.

The goods which were licensed in connection with the program included membership cards, enrollment forms, redemption materials, advertizing signs, equipment necessary to operate the program and software. (See Id. at 1-2). The License Agreement specified the services the sublicensee would receive from S&H and specified that the equipment provided to the sublicensee would be owned by S&H. The goods included in the License Agreement were S&H Greenpoints Program support materials, which are incidental to the primary purpose of the license: S&H provided Defendants (and its sublicensees) with implementation and management of the S&H Greenpoints Program.

The implementation and management of the S&H Greenpoints Program included services provided by S&H, labeled the "InfoPilot" services, which included promotions, database household management, hardware maintenance, software maintenance, data report generation, promotion list preparation, "loyallevel" system maintenance, and electronic payment software. (Id. at 3-4.)  Therefore, the license was primarily a contract for services

10

which involved goods incidental to this purpose.[7]

Therefore, the agreement between the parties in this case primarily involves services, and thus can not be properly analyzed under Pennsylvania's version of Article 2A or Article 2 of the UCC.  Thus, the sublicense will be analyzed under Pennsylvania common law.

## 2. Defendants' Motion for Summary Judgment

Defendants argue that even if the contract is primarily for services, the lack of common law to the contrary enables the Court to look to the UCC for its analysis. Defendants have not cited any legal authority as support for this argument.[8] Therefore, Defendants' arguments based upon common law will be considered.

### a. Defendants did not make the Representations at Issue

Defendants deny that they made any representations and argue that all representations were made by S&H. They further assert that Plaintiffs not have cited evidence that they made any representations. (Doc. #38 at 8-9.) Defendants also assert that

---

[7] The parties characterization of the sublicense in its stipulations supports this interpretation. (See Doc. #45, see Doc. #39, ex 1 Stip. 9.)

[8] All cases cited by Defendants involve the license of <u>goods</u> not services. (See Doc. #44 at 14.)

they presented a "pro forma" financial statement to the retailers
with three different scenarios for potential results, including
one under which a dealer could sustain a loss under the
Greenpoints Program. (Id. at 9.) Defendants cite to the pro forma
financial statements as evidence that they did not adopt the
statements contained within the Business Plan. (Doc. #42 at 5,
Doc. #39, Ex. 2 at 8-9.)

Plaintiffs respond by asserting that a representation was
contained within the Business Plan, and that this representation
was made, disseminated, and affirmed by Defendants at the
Greenpoints Program presentation, although the documents were
created by S&H. (Doc. #40 at 4.) The Business Plan cited by
Plaintiffs describes the deliverables, objectives and programs to
be obtained in year one by quarter. (See Doc. #29, ex. B.)
Plaintiffs characterize the "deliverables" as representations,
and also cite a document entitled the "greenpoints' proposition"
which clearly lists representations in the following bullet
points: "increase bottom line profits 70% year 1, 100% year 2,
10% sale growth over 2 years and 2% margin growth over 2 years."
(Doc. #29, ex. A.) Although these two documents contain S&H
copyright marks, Plaintiffs argue that the documents were adopted
by Defendants, and thus the representations contained within them
are attributable to Defendants. (Id. at 5.) Finally, Plaintiffs
argue that these representations became part of their sublicense

12

with Defendants because the offer made to them by Defendants was based on the promotional materials provided by S&H. (Id. at 6-7.)

To support their claim that Defendants adopted the Business Plan and the Greenpoints Proposition documents, Plaintiffs cite the deposition testimony of L. Ronald Olszewski, President of Franklin Foods, Inc., who admitted that its Answer stated that the written materials prepared by S&H were "repeatedly endorsed and reaffirmed by Defendants' representatives particularly with regard to the representations concerning increased sales and profits" and the affidavit by Arthur Leibhart which corroborates this account. (Doc. # 40 at 5, citing Doc. # 39, ex 4 at 49, and Doc. #40 at ex. A.)

Defendants counter by asserting that Plaintiffs admitted that SuperValu did not make promises. (Doc. #42 at 6.) They cite portions of the depositions of Scozio and Olszewski in which they admitted that one of the documents they were given projected a loss, but Scozio testified that oral promises were made. (Doc. 39, Ex. 3 at 39:3-41:18.) Further in Olszewski's deposition he testified that although they did not ask for a guarantee he understood "deliverables" to be a reference to something they could achieve by going with the program. (Id, ex. 4 at 16:2-18:15.) Thus, Plaintiffs' initial burden to produce evidence that Defendants adopted the S&H materials at issue has been satisfied by their citation of specific evidence.

13

Defendants cite the "pro forma" which projects a possible loss as evidence that they did not adopt the statements projecting increased profits were made in the S&H materials. Defendants cite the depositions of Olszewski and Scozio as evidence that the "pro forma" was distributed and presented by Defendants. (Doc. #39, ex. 3 at 10-11, ex. 4 at 23-24; Doc. #39, ex. 2 at 2.) Plaintiffs do not address this argument. Defendants argue that a warranty claim rests on all statements made by one party to another and cite case law which is based on the UCC, which does not apply to this case. (Doc. #42 at 5.) Thus, Defendants citation to the "pro forma" establishes a genuine issue of material fact regarding whether the sublicense contained the representations within the S&H Business Plan and Greenpoints proposition materials.

**b. Subject Matter of Alleged Representation Contains Future Prediction which is not an Enforceable Representation**

Defendants argue that under the common law rule of Pennsylvania, estimates or predictions relating to a product do not constitute a representation. (Doc. #38 at 9.) Defendants argue that the potential profitability of a product can not be the subject of an express representation. (Id. at 10.)[9]

---

[9] To support these arguments, Defendants cite various cases which discuss the UCC: Trimpey Tire Sales & Service, Inc. v. Stein, 403 A.2d 108 (Pa. Super. Ct. 1979), Royal Business

Plaintiffs respond that the promises made by Defendants involved specific data, and therefore were not mere puffing. (Doc. #40 at 10.) Plaintiffs also argue that the line between what is opinion and what is a representation is a case specific finding.  (Id. at 12, citing 67 AM JUR 2d §736.) Finally, Plaintiffs assert that the promises made by Defendants were the basis for the bargain between the parties. (Id. at 13.)

Defendants' claim that the potential profitability of a service can not be the basis of a representation is based on UCC case law. Defendants also cite Pennsylvania common law to support the general principle that mere puffing is not a warranty. See Michelin Tire Co. v. Schulz, 145 A. 67 (Pa. 1929) (overruled on other grounds AM/PM Franchise Ass'n v. Atlantic Richfield Co., 584 A.2d 915 (Pa. 1990)).[10] However, Defendants do not provide the court with any basis to find the alleged representations would qualify as mere puffing.  Defendants have failed to establish that Plaintiffs' claim is precluded by common law.

---

Machines, Inc. v. Lorraine Corp., 633 F.2d 34 (7th Cir. 1980), and Royal Typewriter Co., Div. Of Litton Business Systems, Inc. v. Xerographic Supplies Corp., 719 F.2d 1092 (11th Cir 1983). (Doc. #38 at 11.)

[10] Plaintiffs counter Defendants' arguments by citing a case which applies the UCC: Sessa v. Riegle, 427 F.Supp. 760 (E.D. Pa. 1977). Further, Defendants' citation to a pre-UCC common law case which involved a sale of tires does not provide this court with much guidance regarding how to evaluate statements made regarding a license for services involving marketing and consumer development. See 145 A. 67 (Pa. 1929).

**c. Express Disclaimer**

Defendants argue that the disclaimer contained in their License Agreement applies to its sublicense with Plaintiffs because Plaintiffs accepted the terms. (Doc. #38 at 14). Plaintiffs argue that the disclaimer in the License Agreement does not apply because, in addition to the fact that they never agreed to its terms, they never even saw it. (Doc. #40 at 13-15.)

Defendants' claim that Plaintiffs are bound by the disclaimer in the License Agreement is premised upon several assertions. First, Defendants argue that Plaintiffs do not have to have signed the License Agreement containing the disclaimer in order for it to be effective against them. This argument is supported by two factual assertions: first, the only agreement Plaintiffs could "sublicense" from is Defendants' License Agreement with S&H and second, Plaintiffs have performed in accordance with the licence terms, and therefore are bound by them. In support of the first assertion, Defendants cite the License Agreement and the Acknowledgment Form which Defendants brief states "expressly stated that they would be bound by the express terms of the License Agreement" (See Doc. #38 at 14, citing Doc. #39, ex. 9 at lines 4-10.) However, Plaintiffs assert that they did not sign the Acknowledgment Form and Defendants do not claim that they did. The Acknowledgment Form states:

> By executing and delivering this letter, the
> undersigned consents to participate in the greenpoints
> Plan and to be bound by the provisions of the Agreement

>for all purposes with respect to those terms of the
>Agreement (including, but not limited to, conditions,
>rights, obligations, performances, restrictions,
>covenants and representations) which are, by their
>nature, for the benefit of the Business Location(s) or
>imposed upon the Business Location(s), but only with
>respect to the Business location(s) listed below.

(Doc. 39, ex 9, lines 4-10.) Below this statement is a signature line for the owner and a "fill in the blank" numerical list captioned "Business Locations". (Id.) Thus, on the face of the document, one could limit the stores owned which would participate in the S&H Greenpoints Program, and presumably withhold consent to the terms of the original License Agreement by failing to "execute and deliver" the letter.

Defendants' citation to the Acknowledgment Form does not support its assertion that the Plaintiffs were put on notice that they would be bound to the terms of the License Agreement because the Acknowledgment Form expressly states that the undersigned is bound by "executing and delivering this letter". (Doc. 39, ex 9, line 4.) Plaintiffs deny that they ever executed the Acknowledgment Form. Defendants' second assertion that Plaintiffs performed in accordance with the terms of the License Agreement by paying $1.90 per 1000 greenpoints acquired by their respective stores for later redemption by their customers, is not supported by any citation to evidence of record. (See Doc. #38 at 14.)

Therefore, Defendants have not established that the Court must disregard the fact that Plaintiffs did not expressly consent to be bound by the terms of the License Agreement. Further,

17

Plaintiffs assert that they were never given an opportunity to review the License Agreement. Plaintiffs cite the depositions of Olszewski and Scozio who testified that Defendants would not show them the License. (See Doc. #39, exs. 3 at 31-32, 4 at 19, 48.) Therefore, the cases cited by Defendants which require assent, authorization, or reading and understanding of the contract: Sullivan v. Allegheny Ford Truck Sales, Inc., 423 A.2d 1292, 1295 (Pa. Super. Ct. 1980); L. B. Foster Co. V. Tri-W Constr. Co., 186 A.2d 18 (Pa. 1962); Hartman v. Baker, 766 A.2d 347, 351 (2000); and Valhal Corp. V. Sullivan Associates, Inc., 44 F.3d 195, 201 (3d Cir. 1995) are clearly distinguishable. In Sullivan, the Court stated:

> It is established that the assent of both parties to the terms of a written contract creates a valid agreement, even though it may not have been signed by one party. A contract need only be signed by the party charged to be binding as long as both parties accept and act under its terms.

423 A.2d at 1295 (internal citations omitted). Thus, Sullivan required that the parties agree to the terms of the contract. That is a major factual dispute in this case. Further, in Sullivan both parties had read the document containing the disclaimer, unlike the facts here where the Plaintiffs claim that their requests to see the License Agreement were refused.

    In Hartman, the parties negotiated a document which was not signed but was understood to memorialize their agreement. 766 A.2d at 350. The Court determined that when "the parties agree

18

upon essential terms and intend them to be binding, a contract is formed..." even if signatures do not appear on the document because the agreement can be accepted by performance. Id. at 351.

The case <u>L.B. Foster</u> refers to the general rule that it is immaterial where a signature appears on an agreement as long as it represents the parties' intentions. 186 A.2d at 19. The Court then discusses the fact that this rule does not apply to a warrant of attorney to confess judgment. <u>Id</u>. Plaintiffs did not sign the License Agreement, and there is no warrant of attorney to confess judgment in this case.   In <u>Valhal</u>, the limited holding of <u>L.B. Foster</u> is discussed and distinguished from limitation of liability clauses. 44 F.3d at 200. The Court cited the Pennsylvania rule that a contract does not have to be signed when the surrounding circumstances demonstrate that the parties manifested consent to its terms. 44 F.3d at 201, citing <u>Westinghouse Electric Co. v. Murphy, Inc.</u>, 228 A.2d 656, 660-61 (Pa. 1967). Again, the case does not establish that a party who never read the contract and who was refused access to it after making a request can be bound to its terms.

Because Plaintiffs have produced evidence that they were not shown the License Agreement and therefore did not agree to its terms, there is a material issue of fact regarding whether Defendants and Plaintiffs agreed to be bound by the terms of the original License Agreement in the performance of the

19

sublicense.[11] Therefore, whether the disclaimer contained within the original License Agreement can limit Defendants' potential liability for the representations which were allegedly breached is an issue to be determined by the trier of fact.

## 3. Counterclaim for Breach of Contract

Defendants request summary judgment in their favor on their counterclaim based upon Jovijo's admission that it owes a debt. Plaintiff Jovijo does not dispute its obligation to pay for the services it received, but contests the amount due, based upon a challenge to the accuracy of Defendants' invoices. Defendants reply that Jovijo can not rely on a mere assertion of belief, but must establish that material facts are in dispute. (Doc. # 42 at 8.) Defendants cite the affidavit of Robert McCarthy in support of their position that they properly billed Jovijo. (Id. at 9, and ex. A.) However, the affidavit does not reveal how Defendants arrived at the figure of $50,450.87 although they will have the burden f proof at trial. Plaintiff Jovijo cites the deposition testimony of Scozio who testified that:

> At the beginning of the Greenpoints Program, the complexity of paying for points issued and points redeemed and the structure of the program itself, it's very hard to reconcile the billings and at the very

---

[11] The agreement to which Defendants argue that Plaintiffs are bound contains a choice of law provision and a forum selection clause which applies Massachusetts law, and identifies Boston, Massachusetts as the proper forum.  The parties argue only Pennsylvania law in their briefs.

beginning particularly SuperValu was unable with any
certainty to tell you that the charge that you're being
charged for Greenpoints is accurate.

(Doc. #40 at 16., citing Doc. 39, ex 3 at 44:18-45:2.)

Therefore, the testimony of these two individuals
establishes a genuine issue of material fact regarding the amount
owed by Jovijo. Therefore, the Motion for Summary Judgment filed
by Defendants on their counterclaim should be denied.


III.   **CONCLUSION**

For the foregoing reasons, it is recommended that the
Motion for Summary Judgment (Doc. # 37) filed by Defendants be
denied.

In accordance with the Magistrates Act, 28 U.S.C.
§ 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for
Magistrates, the parties are allowed ten (10) days from the date
of service to file objections to this report and recommendation.
Any party opposing the objections shall have seven (7) days from
the date of service of objections to respond thereto.  Failure to
file timely objections may constitute a waiver of any appellate
rights.


                                    _/s/ Ila Jeanne Sensenich_
                                    ILA JEANNE SENSENICH
                                    United States Magistrate Judge


Dated: November 23, 2005

```
cc:  The Honorable Arthur J. Schwab
     United States District Judge

     John D. Eddy, Esq.
     EDDY & OSTERMAN
     564 Forbes Avenue
     Pittsburgh, PA 15219

     Charles Kelly, Esq.
     Barbara A. Scheib, Esq.
     SINCLAIR, JACKSON, REINHART & HAYDEN
     501 Corporate Dr., Ste. 200
     Canonsburg, PA 15317
```